IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Parentage of: | ) | No. 32149-5-III |
| | ) | |
| B.C.P. and P.A.P.,[†] | ) | |
| | ) | |
| Minor Children, | ) | |
| | ) | |
| CHRISTOPHER PIERCE, | ) | |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| and | ) | |
| | ) | |
| ELIZABETH BROUSSARD, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — The trial court awarded Christopher Pierce primary residential placement of the his and his ex-girlfriend's two boys despite finding the existence of a limiting factor, i.e., Mr. Pierce once assaulted Elizabeth Broussard in a manner causing her to fear grievous bodily harm. The trial court also ordered mutual decision making and dispute resolution. We are asked to review the trial court's decision

---

[†]For purposes of this opinion, the minor children's initials are used in place of their names.

No. 32149-5-III
*In re Parentage of B.C.P. & P.A.P.*

to determine whether it conforms to applicable law. We conclude that RCW

26.09.191(1)(c) and *In re Marriage of Caven*, 136 Wn.2d 800, 810, 966 P.2d 1247 (1998)

require us to reverse the ordered mutual decision making and dispute resolution, and to

remand for additional findings pursuant to RCW 26.09.187. In addition, because the

paramount concern is what is in the best interest of the children, we allow the trial court

to make an informed decision by giving it the discretion to order a supplemental guardian

ad litem (GAL) report to address concerns, if any, which have developed since its

August 20, 2013 decision.

## FACTS

Mr. Pierce served in the Army for about two and one-half years. During his time

in the Army, Mr. Pierce saw combat in Afghanistan. He returned from Afghanistan in

January 2003 and later was diagnosed with post-traumatic stress disorder (PTSD). He

was honorably discharged in December 2003 due to this medical condition.

Both prior to and following his discharge, Mr. Pierce was charged and convicted

of various crimes. In July 2003, Mr. Pierce was charged and convicted of minor in

possession. In 2004, he was charged and convicted of urinating in public and vehicle

prowl. In 2010, he was charged with driving under the influence, but pleaded guilty to

negligent driving, with a blood alcohol concentration of .080/.085. In June 2012, Mr.

2

Pierce was charged with felony assault of Ms. Broussard. Mr. Pierce entered and completed a diversion agreement resulting in the dismissal of the felony charge. Because this felony assault is the basis for our reversal, it will be discussed in detail later.

Mr. Pierce and Ms. Broussard met in 2006. They began living with each other soon afterwards. They are parents of two children. The older child, B.P., was born in Texas in October 2007. In 2008, Ms. Broussard moved to Washington and lived with Mr. Pierce's parents until Mr. Pierce joined the family in 2009. The younger child, P.P., was born in Washington in March 2011.

In early 2012, the couple's relationship ended. Mr. Pierce and Ms. Broussard moved back to Texas separately. The two had a verbal visitation agreement that consisted of alternating weeks with the children.

On June 7, 2012, Mr. Pierce and Ms. Broussard were drinking wine and watching a movie together at Ms. Broussard's residence when the two got into an argument. Ms. Broussard was upset that Mr. Pierce was too drunk to safely pick his mother up from the airport. Mr. Pierce went to his truck, and Ms. Broussard followed him to make sure he was not going to drive. The argument continued, and when Ms. Broussard attempted to return inside, Mr. Pierce blocked her from entering her house and began to choke her. Ms. Broussard fell to the ground with Mr. Pierce's hands choking her around her neck.

According to Ms. Broussard, Mr. Pierce stated he intended to kill her. Ms. Broussard twisted on the ground and escaped Mr. Pierce's grip. Ms. Broussard called 911. Law enforcement arrived and observed injuries on Ms. Broussard consistent with her being strangled, and noted that she had difficulty speaking because of the pressure applied to her throat. The arresting officer noted that Mr. Pierce was drunk and admitted that he "'drank too much and did something stupid.'" Clerk's Papers (CP) at 60. One officer found a loaded gun near where he had arrested Mr. Pierce. Officers later found several loaded military firearms in Mr. Pierce's nearby truck. Later that evening, Mr. Pierce became suicidal. Texas charged him with domestic violence felony assault.

Mr. Pierce continued to see the children after the assault. Within one month, Ms. Broussard traveled with Mr. Pierce and the children to Washington for the Fourth of July. The visitation schedule resumed.

Mr. Pierce entered into a diversion agreement with Texas. Mr. Pierce was required to engage in services for his domestic violence felony assault, stay in contact with his community supervision officer, abstain from alcohol and drug use, and seek gainful employment. Ms. Broussard endorsed the opportunity for Mr. Pierce to receive help for his alcohol and anger problems. Mr. Pierce began counseling on October 2012 and

completed the terms of his diversion agreement in June 2013. Accordingly, Texas dismissed the domestic violence felony assault charge.

In October 2012, Mr. Pierce moved back to Washington. Before he left, Mr. Pierce informed Ms. Broussard that she needed to pick up the children before his early morning flight. Mr. Pierce claimed that Ms. Broussard arrived at his apartment at 3:00 a.m. after a night at a local festival. He further claimed that she fell asleep and that he could not awaken her and, because of this, he took the boys to Washington with him. Ms. Broussard denied all this, and stated that Mr. Pierce took the children to Washington under false pretenses. Upon arriving in Washington, Mr. Pierce filed a petition to establish parentage and a parenting plan. Prior to trial, the children lived with Mr. Pierce at his parents' house.

A four-day trial began on August 14, 2013. In addition to hearing from lay witnesses, the trial court heard testimony from the court-appointed GAL, Jeff Little. Mr. Little interviewed numerous people, gathered documentation, and issued a 25-page report. The report provided compelling reasons to conclude that Ms. Broussard would be the better caregiver to the couple's children. The GAL found that these reasons include that Mr. Pierce had anger issues which affect the children, had a history of abusing alcohol including three alcohol-related arrests, and had mild to moderate PTSD.

5

Significantly, the GAL noted that when Mr. Pierce became drunk and strangled Ms. Broussard in June 2012, he had several loaded firearms nearby and was suicidal.

The GAL highlighted Mr. Pierce's spotty work record which included seven jobs and periods of unemployment since his December 2003 discharge from the military. He compared Mr. Pierce's spotty work record with Ms. Broussard's much more consistent work record. At the conclusion of his report, the GAL recommended that the boys reside with their mother the majority of time, and that the court adopt the mother's proposed parenting plan. The recommendation also prohibited Ms. Broussard's paramour, Chris Patrick, from having contact with the boys.[1]

The trial court disagreed with Mr. Little's conclusions, and awarded Mr. Pierce primary residential placement of the two boys. Despite the award, the court found the existence of a limiting factor, RCW 26.09.191(1), relating to Mr. Pierce's June 2012 felony assault of Ms. Broussard. In its decision, the court emphasized that the children were doing well in their father's care and, although Ms. Broussard was the primary care provider when the boys were younger, the responsibilities were more equally shared when

---

[1] The record shows that Ms. Broussard and Mr. Patrick spent several nights per week together. Mr. Patrick refused to be interviewed by the GAL. Although the GAL performed a criminal background check of Mr. Patrick, and his record was clean, the GAL was against allowing contact between Mr. Patrick and the boys until Mr. Patrick submitted himself to an interview and further screening.

the parents later agreed to a shared residential schedule. The court recognized that the boys lived in Washington for the majority of their lives and had significant contacts with the area. The court further found that Mr. Pierce and the children had active support from Mr. Pierce's family in Washington. The court expressed concerns about Ms. Broussard's paramour in Texas who refused to participate in the GAL's investigation.

The trial court specifically addressed Mr. Pierce's 2012 domestic violence felony assault of Ms. Broussard. The court stated that the assault was a terrible act committed by Mr. Pierce against Ms. Broussard and that it fit the limiting factor contained in RCW 26.09.191(1) and (2). However, the court also found that the felony assault was a one-time event and did not affect the children because they were asleep at the time, and Ms. Broussard did not tell the boys of the assault. The court noted that Mr. Pierce accepted responsibility, entered into and completed a diversion program, and continued with counseling even though it was no longer required.

The trial court found that the felony assault did not change the relationship that Mr. Pierce had with his children or Ms. Broussard. The court noted that Mr. Pierce was with the children within days of the assault, continued to share residential time with Ms. Broussard, and that Mr. Pierce and Ms. Broussard continued to engage in activities and trips together with the children.

7

The trial court expressed a few concerns about the investigation completed by the GAL. The court noted that while the GAL's contact with Mr. Pierce and his family included personal contact and home visits, his contact with Ms. Broussard and her family included only video and telephone conversations and no home visits. The trial court noted that the report's deficiencies were largely not the GAL's fault, but due to the fact that Ms. Broussard lived far away. The court thought that the GAL should have employed a GAL or a social worker in Texas to do some investigation of Ms. Broussard's living arrangements. Also, the court questioned why the GAL did not contact Ms. Broussard's step-grandfather, considering that she was living in his home and planned to have the children live there as well. The court was further concerned that the GAL did not see the children interact with Ms. Broussard.

As for Mr. Pierce's PTSD, the trial court found that it was not an impairment that interfered with Mr. Pierce's parenting functions. The court based this finding on a letter from Mr. Pierce's counselor at the Veteran's Administration who was in the position to know the effects of PTSD. The counselor's letter contradicted the GAL's opinion that Mr. Pierce was not adequately treating his condition. The court did not make any findings relating to Mr. Pierce's use or abuse of alcohol.

8

The trial court adopted the parenting plan as proposed by Mr. Pierce, with a few exceptions. Notably, the court changed the sections pertaining to parental conduct. The court found that Mr. Pierce's June 2012 assault was a limiting factor that needed to be included in the findings, but that the assault did not affect the children.

The final parenting plan as ordered by the court included as a basis for restrictions:

2.1 Parental Conduct (RCW 26.09.191(1), (2))

The petitioner's [Mr. Pierce's] residential time with the children shall be limited or restrained completely, and mutual decision-making and designation of a dispute resolution process other than court action shall not be required, because this parent has engaged in the conduct which follows:

A history of acts of domestic violence as defined by RCW 25.50.010(1) or an assault or sexual assault which causes grievous bodily harm or the fear of such harm.

CP at 115.

Despite this finding, the trial court did not limit Mr. Pierce's residential time with the children. Instead, the court ordered the children to reside with Mr. Pierce for the majority of the year. In the section of the parenting plan addressing restrictions on the residential schedule, the court found, "There is a limiting factor under section 2.1. However, there are no restrictions." CP at 117.

Nor did the trial court limit Mr. Pierce's decision making ability. The court allowed each parent to make day-to-day decisions and ordered joint decision making for

9

major decisions. As for restrictions, the court noted, "There are limiting factors in paragraph 2.1, but there are no restrictions on mutual decision making for the following reasons: the limiting factor has not [sic] found to have affected the children." CP at 119. The court also ordered that the parties participate in dispute resolution to resolve disagreements.

Ms. Broussard appealed. She contends the trial court (1) erred in ordering mutual decision making and dispute resolution contrary to its finding of a limiting factor, (2) erred in awarding primary residential placement to the father despite the father being precluded by law from exercising decision-making authority, (3) erred by failing to require the father to undergo a screening and comprehensive assessment as required by RCW 26.09.191(4), (4) erred by failing to find that the father suffered from a long-term impairment resulting from alcohol abuse, and (5) erred by failing to impose restrictions on Mr. Pierce's residential time contrary to its finding of a limiting factor.

## ANALYSIS

> In matters affecting the welfare of children, such as parenting plans, the trial court has broad discretion, and its decisions are reviewed only for abuse of discretion. But issues of statutory construction are questions of law which [an appellate court] reviews de novo.

*Caven*, 136 Wn.2d at 806 (footnotes omitted).

10

1. *The trial court erred in ordering mutual decision making and dispute resolution*

RCW 26.09.191(1)(c) provides:

The permanent parenting plan shall not require mutual decision-making or designation of a dispute resolution process other than court action if it is found that a parent has engaged in any of the following conduct: . . . (c) a history of acts of domestic violence as defined in RCW 26.50.010(1) or an assault or sexual assault which causes grievous bodily harm or the fear of such harm.

In *Caven*, the Washington Supreme Court held that RCW 26.09.191(1)(c) was clear and unambiguous, and "'requires sole decision-making upon a finding'" of either a "history of acts of domestic violence" or "an assault . . . which causes grievous bodily harm or the fear of such harm." *Caven*, 136 Wn.2d at 806-07 (quoting *In re Marriage of C.M.C.*, 87 Wn. App. 84, 86, 940 P.2d 669 (1997)). We note that neither subsection (c) nor *Caven* explicitly states *which* spouse is entitled to sole decision-making authority. We infer and hold that only the abused spouse should be given sole decision making authority. To hold otherwise would punish the abused spouse, and such a holding would be inconsistent with the intent of the legislature to protect the abused spouse. *See* RCW 26.09.191(2)(m)(i) ("The limitations shall also be reasonably calculated to provide for the safety of the parent who may be at risk of physical, sexual, or emotional abuse or harm.").

11

Here, the trial court's finding that Mr. Pierce had engaged in conduct that caused Ms. Broussard to fear grievous bodily harm is well supported by the record. Mr. Pierce strangled Ms. Broussard so hard she fell to the ground. He said he intended to kill her. He had several loaded guns nearby and was soon after suicidal. This finding compels us to conclude as a matter of law that the trial court erred in allowing Mr. Pierce mutual decision making authority.[2]

2. *Prohibiting Mr. Pierce from having decision making authority requires the trial court to reevaluate the factors listed in RCW 26.09.187 and re-determine which parent should be granted primary residential placement*

Ms. Broussard contends that the trial court's error in awarding mutual decision making requires reversal of the residential schedule. Ms. Broussard argues that Mr. Pierce's inability to make decisions for the children is a dispositive factor in RCW 26.09.187(3) and limits Mr. Pierce's time with the children.

---

[2] The statute actually prohibits "*mutual* decision-making" upon a finding of a limiting factor. Presumably, a trial court could give authority on some decisions to one parent, and for other decisions to the other parent. By disallowing *mutual* decision making, the legislature might have intended to protect the abused parent from needing to communicate and agree with the abuser parent.

There is nothing in the statute which explicitly deprives the abuser parent of all decision-making authority. By giving the abused parent sole decision making authority, and the abuser parent primary residential placement, greater communication between the former parents, ironically, is required. Nevertheless, we are bound by *Caven*.

RCW 26.09.187(3) requires a trial court to consider seven factors when determining the residential provisions in a parenting plan. According to RCW 26.09.187(3)(a), "The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. The child's residential schedule shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors." RCW 26.09.187(3)(a)(iii) requires the court to consider each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(2). "'Parenting functions' means those aspects of the parent-child relationship in which a parent makes decisions and performs functions necessary for the care and growth of the child." RCW 26.09.004(2). Because future performance of parenting functions, including making decisions concerning the children, is only one of seven factors, we hold that Mr. Pierce's lack of decision-making authority does not automatically disqualify him as the primary residential parent. Rather, we remand to the trial court to rebalance the factors.

3.     *The screening and assessment purpose of RCW 26.09.191(4) was met by the GAL's report and litigation of the limiting factor at trial*

Ms. Broussard contends that the trial court erred by not ordering a screening and compressive assessment of Mr. Pierce related to his assault as required by RCW 26.09.191(4).

RCW 26.09.191(4) states, "In cases involving allegations of limiting factors under subsection (2)(a)(ii) and (iii) of this section, both parties shall be screened to determine the appropriateness of a comprehensive assessment regarding the impact of the limiting factor on the child and the parties."

Here, the trial court found the presence of a limiting factor within the meaning of RCW 26.09.191(4). However, we disagree with Ms. Broussard that the trial court erred by not ordering a screening and comprehensive assessment. She is incorrect in claiming that Mr. Pierce was not screened and assessed. The GAL's investigation constituted a screening and assessment of Mr. Pierce. The GAL's 25-page report addressed Mr. Pierce's felony assault of Ms. Broussard, the parties' versions of the assault, Mr. Pierce's counseling that he received afterward, and an assessment of Mr. Pierce's post-assault relationship with his children. Further, much of the trial testimony was focused on these issues. The litigation, including cross-examination, of these issues allowed the trial court

to make appropriate findings. We determine that the purpose of RCW 26.09.191(4) was met.

4. *The trial court was within its discretion by not finding that Mr. Pierce suffered from a long-term impairment resulting from alcohol abuse*

Ms. Broussard contends that the trial court erred by not finding that Mr. Pierce suffered from a long-term impairment resulting from alcohol abuse. As noted above, the trial court did not enter any findings on this issue. The absence of such a finding operates as a finding against Ms. Broussard, who has the burden of proof on this issue. *In re Welfare of A.B.*, 168 Wn.2d 908, 927, 232 P.3d 1104 (2010).

"A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provision of the parenting plan, if any of the following factors exist: . . . (c) A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions." RCW 26.09.191(3).

While the facts show that Mr. Pierce has a history of abusing alcohol, and at trial he even admitted to having a problem with alcohol, the trial court did not abuse its discretion by failing to find that Mr. Pierce had a long-term impairment resulting from alcohol abuse. Mr. Pierce reported to the GAL that his then-current alcohol consumption was rare and that he would occasionally have a beer with a meal. Mr. Pierce also was

15

required to undergo a substance abuse assessment as part of his felony assault diversion program. The result of the assessment was that he was not alcohol dependent. Still, Mr. Pierce attended eight hours of alcohol abuse related instruction.

This court "may not substitute its findings for those of the trial court where there is ample evidence in the record to support the trial court's determination." *In re Marriage of Kovacs*, 121 Wn.2d 795, 810, 854 P.2d 629 (1993). The trial court did not err by failing to find that Mr. Pierce had a long-term impairment from alcohol abuse.

5. *The trial court did not abuse its discretion by failing to limit Mr. Pierce's residential time under RCW 26.09.191(2)*

Ms. Broussard contends that the trial court abused its discretion by failing to limit Mr. Pierce's residential time under RCW 26.09.191(2). She maintains that the court relied on improper reasoning to support its decision not to apply the limiting factor.

Like restrictions on mutual decision making, a trial court can place limitations on a parent's residential time if the court makes the appropriate finding regarding the parent's conduct. *See* RCW 26.09.191(2). Pertinent here, "The parent's residential time with the child shall be limited if it is found that the parent has engaged in any of the following conduct: . . . (iii) a history of acts of domestic violence as defined in RCW 26.50.010(1) or an assault or sexual assault which causes grievous bodily harm or the fear of such harm." RCW 26.09.191(2)(a). The limitation imposed by the court under

16

RCW 26.09.191(2)(a) or (b) must be reasonably calculated to protect the child or other parent from abuse or harm that could result if the child or other parent has contact with the parent requesting residential time. RCW 26.09.191(2)(m)(i).

However, unlike the restriction on mutual decision making, the trial court has the discretion not to apply the limiting factor found in RCW 26.09.191(2)(a). Under RCW 26.09.191(2)(n), "If the court expressly finds . . . that the parent's conduct did not have an impact on the child, then the court need not apply the limitations of (a), (b), and (m)(i) and (iii) of this subsection."

Here, the trial court expressly found that the June 2012 felony assault did not impact the children. Ms. Broussard does not assign error to this finding. Therefore, it is a verity. Because the court made such an explicit finding, it was well within its discretion in not limiting Mr. Pierce's residential time.

APPROPRIATE RELIEF

RAP 12.2 permits this court to reverse, affirm, or modify a trial court's decision and take any other action as the merits of the case and the interest of justice may require. Here, remand is appropriate so that the trial court can reweigh the factors listed in RCW 26.09.187 in light of our decision that RCW 26.09.191(1)(c) and *Caven* forbid Mr. Pierce from having decision-making authority.

17

Because of the nearly two-year delay between the entry of the trial court decision and this court's decision, the interest of justice requires the trial court to consider the parties' present circumstances so that the paramount "best interest of the children" standard may be achieved in determining the proper primary residential parent. *See In re the Marriage of Little*, 96 Wn.2d 183, 198, 634 P.2d 498 (1981). Toward achieving this goal, we give the trial court discretion to reappoint Mr. Little or a new GAL to issue a supplemental GAL report. *In re Marriage of Waggener*, 13 Wn. App. 911, 917, 538 P.2d 845 (1975). Allowing a trial court to consider such evidence serves two other important purposes. First, it allows the trial court to make an informed decision, not constrained by old facts which may no longer be accurate in ever dynamic and changing relationships. Second, it encourages parents to behave during the pendency of their appeal.

## ATTORNEY FEES

Mr. Pierce requests reasonable attorney fees and costs on appeal under RAP 18.1 and RCW 26.26.140.

RCW 26.26.140 gives the court the discretion to award attorney fees in a parentage action. *In re Parentage of Q.A.L.*, 146 Wn. App. 631, 638, 191 P.3d 934 (2008). According to the statute,

The court may order reasonable fees of experts and the child's guardian ad litem, and other costs of the action, including blood or genetic test costs, to be paid by the parties in proportions and at times determined by the court. The court may order that all or a portion of a party's reasonable attorney's fees be paid by another party.

RCW 26.26.140. Because both parties won and lost issues on review, we exercise our discretion to deny Mr. Pierce's request for reasonable attorney fees.

CONCLUSION

We reverse and remand for the trial court to proceed in accordance with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Siddoway, C.J.                    Brown, J.

19